

# NUMBER 13-19-00486-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI − EDINBURG

---

**MSW CORPUS CHRISTI
LANDFILL, LTD.,**                                            **Appellant,**

**v.**

**GULLEY-HURST, L.L.C.,**                                    **Appellee.**

---

### On appeal from the 117th District Court
### of Nueces County, Texas.

---

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Tijerina
Memorandum Opinion by Justice Tijerina**

Appellant and cross-appellee MSW Corpus Christi Landfill, Ltd. (MSW) appeals from the trial court's judgment notwithstanding the verdict (JNOV) reducing the jury's award of damages in its breach of contract action. By seven issues, which we have renumbered and reorganized, MSW contends: (1) the jury's verdict should be reinstated

because the evidence supports the jury's finding on breach of contract and the damages awarded; (2)–(4) the trial court improperly granted appellee Gulley-Hurst, LLC's (GH) motions for partial summary judgment (5) "[i]f damages are not reinstated or remanded, the trial court improvidently rejected MSW's claim for rescission"; (6) the trial court erred in failing to ask the jury to determine MSW's lost profits; and (7) the trial court erred by refusing to "submit MSW's option contract questions" in the jury charge. By two cross-issues, appellee and cross-appellant GH contends that the trial court should have granted its motion for JNOV in its entirety because the evidence is legally and factually insufficient to support the jury's finding that MSW suffered lost opportunity costs. We affirm.

## I.    BACKGROUND

In 2011, GH sold a one-half interest in property it owned to MSW for $7,500,000. MSW financed the entire amount by executing a promissory note payable to GH in the amount of $3,500,000 and by acquiring a $4,000,000 loan from AmeriState Bank. In addition, MSW borrowed another $1,000,000 from AmeriState Bank. The combined $5,000,000 in AmeriState loans were secured by a first lien on 100 percent of the jointly owned property. The parties entered into a landfill operating agreement providing for the operation of a landfill by MSW on the subject property. Subsequently, MSW acquired a loan from AmeriState Bank for $200,000 and secured the note with a second lien on 100 percent of the property.

The parties had disagreements which resulted in a lawsuit filed by MSW and counterclaims by GH. On May 27, 2015, MSW and GH entered into a Mediated Settlement Agreement (MSA), which provides as follows:

2

NOW, THEREFORE, MSW and GH agree as follows:

1. Sale by GH. GH agrees to sell to MSW its undivided one-half interest in the Landfill for a sales price of $9,250,000 conditioned on MSW refinancing and paying off GH the sum of $4,250,000 that remains owing on the seller financing originally provided to GH and GH's share of Net Operating Income from Landfill operations unpaid by MSW. GH shall provide clear title by special warranty deed to its one-half interest subject only to those conditions of title accepted by MSW in the purchase of its one-half of the Landfill in September 2011. Closing on such sale shall be within 120 days. Any title insurance required or other closing costs in connection with such sale shall be the expense of MSW.

2. Sale by MSW. In the event that MSW fails to close the purchase of the one-half interest owned by GH as provided above, MSW agrees to sell its undivided one-half interest to GH for $7,500,000 on the following terms: GH shall refinance the approximately $4,800,000 balance owed to AmeriState Bank by MSW and eliminate all personal guaranties and obligations of MSW and its guarantors for such loan and write off the remaining balance of the $3,500,000 seller-financed note for such one-half interest for the remaining amount of the consideration. In such event, 120 days after the execution of this Agreement MSW shall provide clear title to GH by special warranty deed to its one-half interest subject only to those conditions of title accepted in the purchase of its one-half of the Landfill in September 2011, the liens in favor of AmeriState Bank securing the $5,000,000 loan, the liens securing the $200,000 loan originally in favor of AmeriState Bank, and any liens created or permitted by GH in its operation of the Landfill since August 2013. GH shall arrange for the refinancing of the AmeriState Bank loan and release of guaranties within 120 days after the expiration of the period provided in Section 1 above. Any title insurance required or other closing costs in connection with such refinancing shall be the expense of GH.

The parties further agreed that whether MSW or GH sold the property to the other pursuant to the MSA, the selling party would "convey to the purchaser all of the seller's right, title and interest in the trust funds with Frost Bank, the operating permit for the Landfill, all equipment owned by either party in connection with operating the Landfill," and all other things connected to the operation of the landfill. The parties agreed that "[u]pon closing the sale either under Section 1 or Section 2" of the MSA, "the parties shall

3

file a joint motion to dismiss the Lawsuit with prejudice to the rights of the parties to refile the same in that all matters in controversy in connection with such suit shall have been compromised hereby." Both parties also agreed to release the other from liability.

MSW did not purchase GH's one-half interest in the landfill during the allotted time. The parties dispute the sequence of events that occurred next. However, it is undisputed that MSW gave a signed warranty deed of its one-half interest in the landfill to GH, and GH recorded the deed. It is also undisputed that GH failed to refinance the AmeriState loan in accordance with the MSA.

MSW then filed suit against GH for breach of contract, negligent misrepresentation, fraud, declaratory judgment, constructive trust, conversion, and trespass to try title. MSW sought damages and rescission. The trial court granted several of GH's motions for summary judgment, which disposed of each of MSW's claims except for its claim for breach of contract on the basis that GH failed to comply with the MSA by not refinancing the AmeriState loan and by not forgiving its loan to MSW in a timely manner. The trial court held a jury trial on the breach of contract cause of action. The jury returned a verdict in favor of MSW finding that GH failed to comply with the MSA by not refinancing the AmeriState loan as required by the MSA and awarding MSW $10,235,000 in damages for breach of contract. The jury also awarded MSW $372,484.70 in lost opportunity cost which it found to be the "natural, probable, and foreseeable consequence of [GH's] failure to refinance the AmeriState Bank Loan."

GH filed a motion for a JNOV and a motion to disregard the jury's damages findings while MSW filed a motion to enter judgment on the verdict. The trial court granted in part

4

GH's motion for JNOV and motion to disregard thereby reducing the jury's loss of the bargain damages of $10.235 million to zero due to GH's breach of contract. The trial court denied MSW's motion to enter judgment in part and rendered judgment for MSW to recover $372,484.70 in lost opportunity costs. This appeal followed.

## II. MEASURE OF DAMAGES

By its first issue, MSW contends that we must reverse the trial court's partial JNOV and reinstate the jury's initial damages award of $10.235 million. Specifically, MSW argues that "there is no dispute GH retained control of the" landfill; thus, MSW "was deprived of its ability to sell its interest to a third party," and the evidence supports a finding that MSW, as a seller, is entitled to "recovery of the difference between the price to be paid by GH to purchase MSW's one-half interest and one-half the market value of the Landfill at time of breach, minus any indebtedness owed on the Landfill by MSW."

By its two issues, GH contends that the trial court should have granted its motion for JNOV on the loss of opportunity damages awarded by the jury because the evidence is legally and factually insufficient.

We address these issues together.

## A. Standard of Review

The trial court may only disregard the jury's answer and render a JNOV if a directed verdict would have been appropriate. TEX. R. CIV. P. 301; *Fort Bend Cnty Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991). The trial court properly renders a directed verdict

> when: (1) a defect in the opponent's pleadings makes them insufficient to support a judgment; [(]2) the evidence conclusively proves a fact that

5

establishes a party's right to judgment as a matter of law; or [(]3) the evidence offered on a cause of action is insufficient to raise an issue of fact.

*Brookshire Bros., Inc. v. Wagnon*, 979 S.W.2d 343, 350 (Tex. App.—Tyler 1998, pet. denied) (citing *Edlund v. Bounds*, 842 S.W.2d 719, 723–24 (Tex. App.—Dallas 1992, writ denied)). A JNOV is proper only if no evidence supports the jury's findings or if the movant is entitled to judgment as a matter of law. *Exxon Corp. v. Quinn*, 726 S.W.2d 17, 19 (Tex. 1987).

To prevail, the party not bearing the burden of proof at trial must show that no evidence supports the jury's adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011).

> An appellate court will sustain a no-evidence point of error when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact.

*Plano Lincoln Mercury, Inc. v. Roberts*, 167 S.W.3d 616, 621 (Tex. App.—Dallas 2005, no pet.) (citing *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727 (Tex. 2003); *Mary Kay Inc. v. Woolf*, 146 S.W.3d 813, 817 (Tex. App.—Dallas 2004, no pet.)). If the controlling law permits the vital fact, and more than a scintilla of competent evidence supports the jury's findings, this Court will reverse the JNOV. *Wal–Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003).

We review a trial court's decision to grant or deny a motion for JNOV under a legal sufficiency standard of review. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). Under this standard, we must view the evidence in the light most favorable to the jury's

verdict and indulge every reasonable inference that would support it. *Id.* at 822. We must credit evidence that supports the verdict if reasonable jurors could do so and disregard contrary evidence unless reasonable jurors could not. *Id.* at 827. If more than a scintilla of competent evidence supports the jury's finding, we will uphold it. *Tanner v. Nationwide Mut. Fire Ins.*, 289 S.W.3d 828, 830 (Tex. 2009). The trial court properly denies the motion for JNOV "if, looking at all the evidence in the light most favorable to the fact challenged or the finding found by the jury, a reasonable trier of fact could have formed a firm belief or conviction that the fact or finding was true." *Helping Hands Home Care, Inc. v. Home Health of Tarrant Cnty., Inc.*, 393 S.W.3d 492, 515 (Tex. App.—Dallas 2013, pet. denied) (citing *City of Keller*, 168 S.W.3d at 822–23). The trial court is required to deny a motion for JNOV if any evidence of probative force supports the jury's findings. *Navarette v. Temple Indep. Sch. Dist.*, 706 S.W.2d 308, 309 (Tex. 1986). Furthermore, if the evidence is factually insufficient, as opposed to legally insufficient, the trial court may not grant a JNOV, and it is limited to granting a motion for new trial. *Cullins v. Foster*, 171 S.W.3d 521, 537 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (citing *Alm v. Aluminum Co. of Am.*, 717 S.W.2d 588, 594 (Tex. 1986) ("A trial court may not disregard a jury's answer because it is against the great weight and preponderance of the evidence.")).

## B.    Benefit of the Bargain Damages

In its first issue, MSW argues as follows:

MSW was deprived of its ability to sell its interest [in the landfill] to a third party. The evidence supports the jury's finding and the law supports MSW's recovery of the difference between the price to be paid by GH to purchase MSW's one-half interest and one-half the market value of the Landfill at time of breach, minus any indebtedness owed on the Landfill by MSW (which for reasons explained below was $0): $10.235 Million. . . .

7

> The trial court erroneously granted GH's JNOV on the grounds that "I did not submit the proper measure of damages to the jury[.]" . . . . The law and the evidence support the submission and MSW's recovery; the JNOV must be reversed.
>
> . . . .
>
> Here, GH took possession of MSW's interest, but never paid the purchase price. This was a material breach. GH is now in possession of an asset with a market value of over $35 Million, without having paid anything to MSW for its 1/2 interest worth $17.5 Million. GH forfeited its ability to buy the asset for $7.5 Million because it failed to comply with the purchase contract.

Thus, MSW's argument is premised on the assumption that because GH breached the MSA, GH "forfeited its ability" to buy MSW's interest in the landfill, and MSW as owner of the property is now entitled to damages in the amount of the market value of the property notwithstanding the MSA. However, as discussed below, the MSA contains no such requirement that MSW retains ownership of the property if GH breached the MSA.

The MSA required MSW to purchase GH's interest in the Landfill within 120 days for "$9,250,000 conditioned on MSW refinancing and paying off GH the sum of $4,250,000 that remains owing on the seller financing originally provided to GH and GH's share of Net Operating Income from Landfill operations unpaid by MSW." The MSA specified that if MSW failed to purchase GH's interest, as it did here, MSW would sell its interest in the property to GH for $7.5 million as follows: GH would "refinance the approximately $4,800,000 balance owed to AmeriState Bank by MSW and eliminate all personal guaranties and obligations of MSW and its guarantors for such loan and write off the remaining balance of the $3,500,000 seller-financed note for such one-half interest for the remaining amount of the consideration." The MSA directed that after the expiration

8

of MSW's 120-day window to purchase GH's interest,

> MSW shall provide clear title to GH by special warranty deed to its one-half interest subject only to those conditions of title accepted in the purchase of its one-half of the Landfill in September 2011, the liens in favor of AmeriState Bank securing the $5,000,000 loan, the liens securing the $200,000 loan originally in favor of AmeriState Bank, and any liens created or permitted by GH in its operation of the Landfill since August 2013.

The MSA required GH to "arrange for the refinancing of the AmeriState Bank loan and release of guaranties within 120 days after the expiration of the period provided in" the MSA.

Nothing in the MSA states as MSW argues that if GH failed to comply with the MSA, "GH forfeited its ability to buy the asset for $7.5 Million." The MSA does not provide such a contingency. There is nothing in the MSA stating that if GH failed to comply with the MSA, ownership of the property reverts to MSW, that MSW is not required to accept $7.5 million as agreed to by the parties, or that the terms of the MSA are inapplicable upon the breach of any provision or failure to comply. In addition, the MSA does not state that MSW is entitled to keep its interest in the landfill if GH fails to comply with the terms. The MSA does not provide for a scenario wherein if GH fails to abide by its terms, GH loses the right to purchase the property at the agreed-to terms because the property reverts to MSW.

Therefore, there is no evidence to support an implied finding that: (1) GH's breach of the MSA equated to MSW's continued ownership of one-half interest in the landfill; (2) because GH allegedly "forfeited" its ability to buy MSW's interest in the property for $7.5 million, MSW still owns its one-half interest in the landfill; and (3) therefore, GH is required to pay market value for MSW's interest as benefit of the bargain damages. The MSA does

9

not address the consequences for GH's failure to abide by the terms of the MSA.

Instead, the evidence shows that in compliance with the MSA, MSW gave the deed to its interest in the property to GH, and GH recorded the deed. GH, however, did not refinance the AmeriState loan prior to this lawsuit. As such, there is no disagreement that GH breached the MSA in that respect.[1]

MSW requests that we disregard the terms of the MSA and determine that because GH breached its terms, GH must now purchase MSW's interest in the property for the market value and not pay the price agreed to by the parties in the MSA.[2] However, as explained above, this argument is premised on a false belief that GH "forfeited" its right to purchase the property, a finding that is not supported by the evidence. Therefore, viewing the evidence in the light most favorable to the jury's verdict and indulging every reasonable inference that would support it, crediting evidence that supports the verdict if reasonable jurors could do so and disregarding contrary evidence unless reasonable jurors could not, we conclude that there is no evidence to support the jury's award of damages. *See City of Keller*, 168 S.W.3d at 822, 827. Having determined that the jury's verdict on damages is not supported by the evidence, we conclude that the trial court

---

[1] Nonetheless, according to GH, it "made all installment payments required under the $5,000,000 Note," and "neither MSW nor any of its individual guarantors has been required to make any payments in connection with said Note." Moreover, GH credited MSW's loan as paid in full, meaning that MSW no longer owes GH $3.5 million. Thus, it partially complied with the MSA by the time of the trial.

Thus, as further explained below, we agree with the trial court that MSW is entitled to the loss of opportunity damages awarded by the jury for GH's failure to refinance the AmeriState loan.

We note that, as GH appears to concede, it remains obligated to refinance the AmeriState loan according to the terms of the MSA. Nothing in this memorandum opinion shall be construed to absolve GH of this obligation. Moreover, nothing herein shall be construed as restricting MSW's right to bring a separate suit in the event GH fails to comply with this obligation.

[2] MSW makes no other argument, and it does not request any other amount of money for damages.

properly granted GH's motion for JNOV on the issue of damages. *See id.* We overrule MSW's first issue.[3]

## C.     Lost Opportunity Damages

By its first issue, GH contends that the trial court should have granted its motion for JNOV in its entirety because the evidence is insufficient to support the jury's award of lost opportunity damages in the amount of $372,484.70. MSW argued at trial that it was entitled to lost opportunity damages because GH failed to refinance the AmeriState loan as required by the MSA.

MSW's part owner, Tom Noons, testified that MSW needed GH to refinance the AmeriState loan to acquire another loan from AmeriState. Shane Shoulders, another part owner of MSW, stated that MSW needed GH to pay off the loan to borrow from AmeriState.

MSW's expert witness, Allyn Needham, testified that MSW was entitled to damages under "the economic theory called opportunity costs and the loss of opportunity," which is "a straightforward calculation in that when [GH] did not purchase the one-half interest of MSW . . . the opportunity for them to borrow the remaining outstanding balance, which was a little over $4.6 million at that time, was lost to them." Needham stated, "the lost opportunity cost of not having use of the money that was a natural, probable, and foreseeable consequence of [GH's] failure to refinance the Ameri[S]tate loan." Needham explained that "the concept of opportunity cost" occurs when a party "borrows so much money, and if [that party] already borrowed it, then [that

---

[3] MSW does not make any other argument concerning why the trial court's JNOV is improper.

11

party] can't borrow it to do something else." According to Needham, the important question to his assessment of the loss of opportunity MSW suffered "was whether or not [MSW] had this additional $4.6 million available to them for another investment." Needham testified that he "used a minimum rate, the risk free rate that could have been achieved by just putting money in treasury bills" which would amount to a return of "around 9 percent on that money." Needham opined that MSW's loss of opportunity damages were $372,484.70.

Thus, in summary, MSW presented evidence that because GH did not refinance its AmeriState loan as required by the MSA, MSW suffered lost opportunity damages. Through Needham's testimony, MSW established that they were entitled to $372,484.70 for that loss. Accordingly, viewing the evidence in the light most favorable to the jury's verdict and indulging every reasonable inference that would support it, crediting evidence that supports the verdict if reasonable jurors could do so and disregarding contrary evidence unless reasonable jurors could not, we conclude that there is more than a scintilla of evidence to support the jury's award of loss of opportunity damages. *See City of Keller*, 168 S.W.3d at 822, 827. Having determined that the jury's verdict on damages is supported by the evidence, we conclude that the trial court properly denied GH's motion for JNOV on the issue of loss of opportunity damages. We overrule GH's first issue.[4]

---

[4] By its second issue, GH contends that the evidence is factually insufficient to support the jury's award of lost opportunity damages; therefore, the trial court should have granted its motion for JNOV on that basis. However, "[a] trial court may not disregard a jury's answer because it is against the great weight and preponderance of the evidence." *Alm v. Aluminum Co. of Am.*, 717 S.W.2d 588, 594 (Tex. 1986). Accordingly, we reject this argument and overrule GH's second issue contending that it was entitled to a JNOV because the evidence is factually insufficient to support the jury's verdict. *See id.*

12

## III.    SUMMARY JUDGMENT

### A.    Standard of Review

We review a trial court's summary judgment de novo. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156 (Tex. 2004). To prevail on a traditional motion for summary judgment, the movant must show "there is no genuine issue as to any material fact and the [movant] is entitled to judgment as a matter of law[.]" TEX. R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). In our review of the trial court's judgment, we examine "the evidence presented in the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009); *see City of Keller*, 168 S.W.3d at 827. "We indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Rhone–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999); *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 756 (Tex. 2007) (per curiam). "Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal." TEX. R. CIV. P. 166a(c); *see also Khan v. Chaudhry*, No.1 09-14-00479-CV, 2016 WL 1158734, at *7 (Tex. App.—Beaumont Mar. 24, 2016, pet. denied) (mem. op.).

### B.    Title Transfer

By its second issue, MSW contends that the trial court improperly granted partial summary judgment in favor of GH on its causes of action for declaratory judgment,

13

trespass to try title, and suit to quiet title because it improperly made findings of fact that contradict the jury's findings. Specifically, MSW complains that summary judgment was improper because the evidence showed that MSW did not intend to transfer title to GH when it sent the deed to GH. MSW claims that the summary judgment evidence established that GH was required to hold the deed "in escrow and trust until [GH] satisfied all of [GH's] obligations" and that it "was not required to transfer assets unless GH closed the sale."

### 1.    Pertinent Facts

On March 16, 2018, GH moved for partial traditional summary judgment on MSW's request for declaratory judgment that the transfer of the deed to GH was null and void. Specifically, GH argued that: the "Deed and Transfer are instruments executed by Noons on behalf of [MSW] before a notary public and filed as of public record"; the MSA and any communications of the parties did not create any conditions precedent to the delivery of the deed and transfer, letters written by the parties counsel did not create an "agreement, expressed or implied, that the Deed and the Transfer would be held in escrow pending any refinancing"; no one made "representations that such instruments would be held in escrow pending any refinancing"; and a "September 24, 2015 letter [attached to the partial summary judgment motion] expressly negates any such representations in writing." MSW countered that "[w]hen [it] entered into the [MSA], it relied on [GH's] representations that if MSW did not purchase [GH's interest] then [GH] would satisfy each of the terms of the purchase of MSW's [interest] within the 120-day period . . . ." In addition, MSW claimed that it was entitled to a declaratory judgment that the transfer of the deed was null and

14

void because MSW "never intended that it be acted upon prior to satisfaction of all conditions of [GH's] required performance." The trial court granted GH's motion for traditional summary judgment on MSW's claim for declaratory relief on May 10, 2018.

On May 25, 2018, GH filed a motion for partial traditional summary judgment on MSW's trespass to try title claim and its suit to quiet title. Specifically, GH argued that "MSW cannot claim to possess title or that it has established title because it voluntarily conveyed title to [GH] by Deed and Transfer pursuant to the [MSA]." Regarding MSW's cause of action to quiet title, GH argued "MSW cannot show that it has an interest in the Landfill at all unless it can [in] some way defeat the delivery of the Deed and Transfer in which it voluntarily conveyed title to [GH] on September, 2015" and "[w]ithout such title, it cannot satisfy the first step in a suit to quiet title."[5]  GH further argued that the "exchange of letters and emails by counsel to the parties in September, 2015 did not . . . establish a contract concerning a trust or escrow or . . . bailment arrangement under the statute of frauds, so MSW cannot, as a matter of law, assert a suit to quiet title in that regard." Finally, GH stated that "[t]he undisputed facts within the four corners of the instruments provided as summary judgment evidence confirm the non-existence of any agreement to hold the Deed and Transfer instruments in escrow, in trust, or pursuant to a bailment," and "[t]he Deed and Transfer were delivered and promptly filed of record in order to satisfy

---

[5] A suit to quiet title claimant must show that it has an interest in the specific property, the defendant's wrongful claim to the property affects the title to the property, and although the defendant's claim to the property is facially valid, it is actually invalid or unenforceable. *See Vernon v. Perrien*, 390 S.W.3d 47, 61 (Tex. App.—El Paso 2012, pet. denied).

MSW's expressed obligation to 'provide clear title to GH by special warranty deed of its one-half interest' as specifically required by the" MSA.

MSW replied that it had not voluntarily transferred title to GH because it relied on GH's false representations and GH failed to perform on the MSA. The trial court granted GH's motion for partial summary judgment on MSW's trespass to try title claim and suit to quiet title on August 29, 2018.

### 2. Discussion

On appeal, MSW argues that when it gave the signed deed to GH, it did not intend to transfer title to GH. Therefore, MSW asserts that the trial court improperly granted GH's motions for partial summary judgment on its claims for declaratory judgment, trespass to try title, and its suit to quiet title. To support its argument, MSW cites to myriad non-summary judgment evidence it claims supports a conclusion that either a question of fact exists regarding its intent to transfer title or that as a matter of law it did not intend to transfer its title to its one-half interest. However, MSW does not cite its response to GH's motions for partial summary judgment. Instead, it cites its motion to reconsider granting partial summary judgment, the reporter's record of argument of counsel, and affidavits, emails, and letters which are included in the clerk's record but not included as summary judgment evidence.

We are not required to scour the record to find support for MSW's arguments. *See Garrod Invs., Inc. v. Schlegel*, 139 S.W.3d 759, 766 (Tex. App.—Corpus Christi–Edinburg 2004, no pet.). In addition, the evidence supporting an appellant's argument must be the summary judgment evidence attached to the pertinent motion for summary judgment or

the pertinent non-movant's reply. *See* TEX. R. CIV. P. 166a(c). Moreover, MSW does not explain why intent matters to our analysis of this issue, and it has not cited case law providing that, even after a seller delivers a deed, the seller retains some actual or equitable interest in the property if it didn't intend to transfer title.

Nonetheless, we have reviewed MSW's responses to GH's motions for partial summary judgment. Concerning its claims for trespass to try title and to quiet title, MSW did not argue that it lacked the intent to transfer title to GH in its response to GH's May 25, 2018 motion for partial summary judgment, and MSW does not cite where it did so. Accordingly, we are unable to reverse the trial court's summary judgment on MSW's trespass to try title and quiet title claims on that basis. *See id.* MSW did, however, argue in its response to GH's March 16, 2018 motion for partial summary judgment that it was entitled to a declaration that the transfer of title was null and void because MSW had not intended to transfer title to GH. Accordingly, we address the intent issue only insofar as it concerns the summary judgment on MSW's declaratory judgment action. *See id.*

First, we note that the MSA, which was attached as summary judgment evidence, does not state that once MSW gives clear title to GH, GH must hold the deed in escrow prior to carrying out its obligations such as refinancing "the approximately $4,800,000 balance owed to AmeriState Bank by MSW," eliminating "all personal guaranties and obligations of MSW and its guarantors for such loan" and writing "off the remaining balance of the $3,500,000 seller-financed note for such one-half interest for the remaining amount of the consideration" as claimed by MSW. The MSA states that

> [i]n the event that MSW fails to close the purchase of the one-half interest owned by GH . . . . *MSW agrees to sell its undivided one-half interest to GH*

17

> *for $7,500,000* on the following terms: GH shall refinance the approximately $4,800,000 balance owed to AmeriState Bank by MSW and eliminate all personal guaranties and obligations of MSW and its guarantors for such loan and write off the remaining balance of the $3,500,000 seller-financed note for such one-half interest for the remaining amount of the consideration. In such event, *120 days after the execution of this Agreement MSW shall provide clear title to GH by special warranty deed* to its one-half interest subject only to those conditions of title accepted in the purchase of its one-half of the Landfill in September 2011, the liens in favor of AmeriState Bank securing the $5,000,000 loan, the liens securing the $200,000 loan originally in favor of AmeriState Bank, and any liens created or permitted by GH in its operation of the Landfill since August 2013.

(Emphasis added). Thus, the MSA, as written, required that if MSW did not purchase GH's interest within the allotted time, MSW agreed to sell its interest in the landfill to GH for $7.5 million. In addition to agreeing to sell its interest to GH, MSW agreed that 120 days after executing the MSA, MSW would be required to "provide clear title [of its interest in the landfill] to GH by [special] warranty deed." The title would be subject only to "those conditions of title accepted in the purchase of [MSW's] one-half of the Landfill in September 2011, the liens in favor of AmeriState Bank securing the $5,000,000 loan, the liens securing the $200,000 loan originally in favor of AmeriState Bank, and any liens created or permitted by GH in its operation of the Landfill since August 2013." The MSA does not state that MSW's delivery of the deed to GH is conditioned on GH's prior fulfilment of the terms of the sale.

Next, GH provided as summary judgment evidence, a letter by its counsel, John Bell, to MSW's counsel, Anthony Laporte, stating, in pertinent part, the following:

> Section 2 of [the MSA] requires that in the event MSW fails to close the purchase by the deadline, it agrees to provide clear title to [GH] by Special Warranty Deed to its one half interest in the property. Enclosed is a Special

18

Warranty Deed following the State Bar form, and utilizing the same form by which the property initially was conveyed to MSW that makes the above conveyance subject to the existing liens in favor of AmeriState Bank securing the $5,000,000 loan [and] the $200,000 loan. As required by Section 2 of the [MSA], [GH] will arrange for refinancing of the AmeriState Bank loan and release of the guaranties within 120 days from September 24, 2015.

In a letter dated September 24, 2015, and attached to MSW's response to GH's March 16, 2018 motion for partial summary judgment, Laporte stated, in pertinent part, the following:

To our knowledge these conditions have not been met. In order to protect the interests of MSW while moving forward under the terms of the Agreement, MSW proposes that it deliver the Special Warranty Deed (subject to the comments set forth below) and the Transfer of Interest in Landfill (collectively, the "Closing Documents") to a title company ("Escrow Agent"), mutually agreeable to MSW and GH, to be held in escrow pending the following:

a. Escrow Agent has received from GH a full and complete release of the GH Note and the original of the [GH] Note, marked "Paid in Full"[sic].

b. Escrow Agent has received a full and complete release, acceptable to MSW in its reasonable discretion, of (A) all obligations of MSW with respect to the Ameristate Loan and (B) all personal guaranties of the Ameristate Loan.

. . . .

Additionally, the Agreement provides that the conveyance from MSW to GH will be subject to any liens created or permitted by GH in its operation of the Landfill since August 2013. In order for MSW to verify that no such liens have been created, MSW should be provided with a current title commitment covering the Landfill property.

We believe that our proposal complies with both the terms and the spirit of the [MSA] while allowing your client the time to comply with the conditions to the conveyance and protecting our client in the interim. We are happy to prepare an Escrow Agreement to be executed by the parties evidencing the matters set forth in this letter.

19

In response, Bell sent a letter stating the following:

> Thank you for your prompt response to my letter of September 22, 2015, concerning performance under the [MSA]. In contrast to your letter, the [MSA] does not establish any conditions to delivery of the Deed by MSW other than the failure of a closing under Section 1 within 120 days. Section 2 specifically provides that "120 days after the execution of this Agreement MSW shall provide clear title to GH by special warranty deed to its one-half interest subject only to [certain permitted liens]." It then provides that [GH] has 120 days after that date to refinance the AmeriState loan.
>
> In order to provide your clients assurance that the refinancing will occur, this lawsuit was not dismissed but re-set to Monday, February 1, 2016, so that you may seek appropriate enforcement of the Agreement's terms if the refinancing does not occur by January 23, 2016, which is the 120-day deadline. There is no basis for withholding the Deed another 120 days to secure that obligation.
>
> As for *the $3,500,000.00 Promissory Note*, I have the original Note in my office and am ready to mark it "Paid in Full" upon receipt of the Deed. *I am willing to hold the Deed in escrow pending delivery to you of the Note marked "Paid in Full,"* and I will record a Release of Liens at the same time as recording of the Deed. Nothing in the Agreement requires the use of a title company or escrow agent to hold such documents. If you or Mr. Noons would prefer, the Deed can be personally delivered to my office by someone and I will exchange the Note marked "Paid in Full" but we should conclude this matter without further delay.

(Emphasis added).

On September 30, 2015, Bell sent the following email: "The Deed and Transfer finally were delivered by FEDEX at 2:00 pm. I was out of the office at a meeting but have returned. You are authorized to mark the original Note delivered to you this morning PAID and release it." Elizabeth Johnson, MSW's counsel, sent the following email to Bell and Laporte: "[Bell], attached are copies of the Deed and Transfer. The originals are being overnighted to you. I trust that you will do the same with the original note to me." GH also

20

attached copies of the deed signed by Noons and notarized and the transfer signed by Noons.

The summary judgment evidence establishes that GH informed MSW that GH would only agree to hold the deed in escrow pending MSW's receipt of the note showing that MSW had paid its loan for $3.5 million in full to GH. Thus, the evidence conclusively proved that (1) the MSA was silent regarding when GH could record the deed, (2) MSW knew that GH planned on recording the deed prior to refinancing the AmeriState loan, and (3) MSW still decided to give the deed to GH. This evidence belies MSW's claims that it had not intended to transfer title to GH, and any evidence supporting those claims has been conclusively negated. *See City of Keller*, 168 S.W.3d at 814 (explaining that disputed evidence may nonetheless be conclusive). Therefore, viewing the evidence in the light most favorable to MSW, crediting evidence favorable to it if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, we conclude that there is no evidence to support its claim that it had not intended to transfer title to GH. *See Mann Frankfort Stein & Lipp Advisors, Inc.*, 289 S.W.3d at 848; *see also City of Keller*, 168 S.W.3d at 827. Accordingly, we overrule MSW's second issue.

## C.    MSW's Other Causes of Action

By its third issue, MSW states:

By Counts 6–10 and 11, MSW alleged breaches and claims related to GH's improper handling of MSW's deed. By Counts 2–5, MSW alleged claims arising from the Landfill Operating Agreement. These claims are all inextricably intertwined with those discussed above; a decision in MSW's favor on the issues presented above compels a decision that summary judgment on these additional claims was improper. They must be remanded.

21

As we understand it, MSW argues that if it prevails on its other issues, then we must remand its causes of action in counts 6–10 and 11. However, we have overruled MSW's issues; therefore, this issue fails.

In any event, MSW does not state what these causes of action were, what the elements of these causes are, and how the summary judgment evidence generated a fact issue as to any of the elements. *See* TEX. R. APP. P. 38.1(i). In addition, as GH points out, by this issue, MSW complains of the trial court's summary judgment rulings on ten different counts resolved by the trial court in three different motions for partial summary judgment.

Nevertheless, MSW specifically only argues as follows:

MSW's summary judgment evidence included deposition testimony from Mike Hurst admitting (1) GH's purchase requirements and deadline, (2) MSW's right to reject a refinance after the deadline, and (3) GH had not performed under the MSA. GH's counsel recognized GH's deadlines and performance requirements. Ameri[S]tate advised GH an assignment [or] assumption is not the refinance the MSA required. This evidence was also adduced at trial.

As we know, the trial judge rejected MSW's position and evidence, and credited GH's position and evidence, making numerous "findings" when granting GH's summary judgment motions. But the true factfinder—the jury—made polar opposite findings. GH did not comply with the MSA, and did not purchase MSW's one-half interest. Summary judgment was improper. MSW's Operating Agreement and deed claims survive. Regarding Counts 2–5, because GH failed to comply with the MSA and thus failed to purchase MSW's one-half interest, the MSA lapsed on its own terms and the parties return to their claims in the underlying lawsuit. GH wrongfully refused MSW's access to financial records, excluded MSW's representatives from the site, and continued to hold itself out as sole owner of the Landfill. Regarding Counts 6–10 and 11, because the jury found GH failed to timely perform under the MSA and materially breached the MSA, GH improperly recorded the deed and held itself out as 100% owner. MSW is entitled to all appropriate remedies.

22

(Internal citations omitted).

MSW does not explain how this evidence supports its position that it negated GH's summary judgment evidence relied upon by the trial court on each element of the unmentioned causes of action. Without more, we are unable to determine whether the trial court improperly granted GH's numerous motions for summary judgment. *See* TEX. R. APP. P. 38.1(i). We overrule MSW's third issue.

## D.    Fraud

By its fourth issue, MSW contends that the trial court should have denied GH's motion for partial summary judgment on MSW's fraud claim. MSW argues that the trial court improperly determined that GH had no duty to disclose financial information concerning operation of the landfill during the 120-day purchase period. MSW does not specifically state what it claims GH falsely represented or failed to disclose.

"[N]o duty of disclosure arises without evidence of a confidential or fiduciary relationship." *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998) ("Fiduciary duties arise as a matter of law in certain formal relationships, including attorney-client, partnership, and trustee relationships."). "Outside of the cases in which formal fiduciary duties arise as a matter of law, confidential relationships may arise when the parties have dealt with each other in such a manner for a long period of time that one party is justified in expecting the other to act in its best interest." *Id.* "Absent an agreement to the contrary, a cotenant has no fiduciary obligation to the other cotenants." *Glover v. Union Pac. R.R.*, 187 S.W.3d 201, 218 (Tex. App.—Texarkana 2006, pet. denied) (citing *Scott v. Scruggs*,

23

836 S.W.2d 278, 282 (Tex. App.—Texarkana 1992, no writ)); *Donnan v. Atl. Richfield*, 732 S.W.2d 715, 717 (Tex. App.—Corpus Christi–Edinburg 1987, writ denied).

In its fifth amended petition, MSW claimed that GH committed fraud by making "material misrepresentations and omissions regarding status of the landfill when inducing MSW to enter into the [MSA], and when inducing MSW to forego its option and thereby allowing GH to attempt to exercise GH's option to purchase MSW's one-half interest of the Landfill business." MSW also stated, "GH knew that there was a potential buyer for the Landfill and failed to disclose the fact of the buyer to MSW with the intent of coercing MSW into the [MSA] and the terms contained therein, and coercing MSW to forego its option" and "GH knew the financial status of the Landfill had materially changed and did not disclose the true financial status or financial information of the Landfill to MSW." In the trial court, MSW claimed that it had entered the MSA because "it justifiably relied on GH's prior representations (and nondisclosures) that the Landfill was in the same position as it was when MSW was last operating the Landfill," which it would not have entered if had known the falsity of the statements and of the omitted information. In addition, MSW alleged that GH's counsel "made [a] material misrepresentations regarding their agreement to hold the Deed and other transfer documents in trust until the conditions precedent under the [MSA] were accomplished and coerced MSW into sending the Deed and transfer documents pursuant to the same." MSW sought exemplary damages due to GH's alleged malice and conscious indifference.

In its motion for partial summary judgment on MSW's fraud claim, GH argued that "the sole relationship between [GH] and MSW was as tenants in common concerning the

24

Landfill" and "[a]s cotenants, neither [GH] nor MSW were under a duty to make disclosures otherwise required of parties in a fiduciary relationship." GH claimed that therefore, "even if [GH] knew of a buyer of the Landfill in May 2015, [GH] had no duty to disclose this information because no fiduciary relationship existed between it and MSW." Thus, the basis for the trial court's ruling was that GH as a cotenant had no duty to disclose the complained-of information because no fiduciary duty existed. *See State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 381 (Tex. 1993) (providing that appellant must address every possible theory addressed in motion for summary judgment if the trial court fails to state its reason). MSW does not challenge the trial court's implied ruling that as cotenants no fiduciary relationship existed and therefore no duty to disclose arose. *See id.*

Instead, MSW argues that "a seller of real estate had a duty to disclose material facts not reasonably discoverable by the buyer" and that a duty to disclose exists when "the defendant created a false impression by making a partial disclosure" or "the defendant voluntarily disclosed some information and therefore had a duty to disclose the whole truth." However, MSW does not cite the record where it made these arguments to the trial court in its responses to GH's motions for partial summary judgment. The record is voluminous comprised of several motions for partial summary judgment, amended motions for partial summary judgment, responses, and replies. We have no duty to scour the documents on file to determine whether the trial court properly granted the partial summary judgment at issue here. *See Garrod Invs., Inc.*, 139 S.W.3d at 766. Accordingly, we overrule MSW's fourth issue.

25

## IV.  RESCISSION

By its fifth issue, MSW claims that "[t]he trial court rejected its claim for rescission of the MSA, improvidently believing GH substantially complied and MSW would be adequately compensated with damages for whatever breach it could prove." MSW argues in its brief that its "only remaining remedy is rescission" and that "[t]he parties must return to their pre-MSA positions, as undivided one-half interest owners in the Landfill, with disputes to be resolved under their Operating Agreement."

MSW states that the jury's findings that "GH failed to arrange for the refinancing of the Ameri[S]tate loan, and failed to release the guarantees, as required by the MSA" "expressly discredit the trial court's improper, contrary fact findings made pre-trial, including that time was not of the essence and that GH had no time certain to perform its obligations." According to MSW, "[t]he clear language of the MSA imposing multiple deadlines for action by both parties supports the jury's verdict (which GH has not contested)."

MSW does not cite the record wherein it requested the relief of rescission. *See* TEX. R. APP. P. 38.1(i). MSW acknowledges that the trial court made a dispositive ruling pre-trial on its rescission claim; however, MSW does not share where in the record we may review that ruling. Instead, MSW generally cites the jury's verdict, GH's motion for JNOV, and one of its exhibits admitted at trial. We are not required to scour this voluminous record in order to determine whether the trial court abused its discretion by denying MSW's request for rescission, and without such citation we are unable to conduct

26

a proper analysis of the issue. *See Garrod Investments, Inc.*, 139 S.W.3d at 766; *see also*

Tᴇx. R. Aᴘᴘ. P. 38.1(i). Accordingly, we overrule MSW's fifth issue.

## V.     Lᴏsᴛ Pʀᴏꜰɪᴛs

By its sixth issue, MSW states:

In the alternative, the case should be remanded for a determination of MSW's lost profits. The trial court erred by refusing to submit MSW's lost profits question. GH has retained control of the Landfill since (as the jury found) GH failed to purchase MSW's one-half. Because liability is not contested, a remand for damages only is proper. MSW should have been permitted, and must now be permitted, discovery of Landfill financial information post-2015 and full presentation at trial.

. . . .

The court submitted questions asking whether GH arranged for financing and released the personal guarantees as required by the MSA. If the jury answered yes—which it did—then GH did not buy MSW's interest, thus MSW is still an owner. This entitles MSW to lost profits from the ongoing business. The court should have submitted the lost profits question. GH has not contested the jury's "yes" findings. The case should be remanded for a lost profits determination. MSW would be entitled to complete discovery of the Landfill's financial information, and full presentation of the evidence to the jury, both of which the trial court refused.

(Internal citations omitted).

We review a trial court's decision to submit or refuse a particular instruction or question to the jury under an abuse of discretion standard. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or if it acts without reference to any guiding rules or principles. *Moss v. Waste Mgmt. of Tex., Inc.*, 305 S.W.3d 76, 81 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). We review de novo as a question of law whether the charge submits

27

the proper controlling issues in the case, in terms of theories of recovery or defense. *Fin. Ins. v. Ragsdale*, 166 S.W.3d 922, 926 (Tex. App.—El Paso 2005, no pet.).

"If an instruction might aid the jury in answering the issues presented, or if there is any support in the evidence for an instruction, the instruction is proper." *La.-Pac. Corp. v. Knighten*, 976 S.W.2d 674, 676 (Tex. 1998) (per curiam). "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855 (Tex. 2009); *see* TEX. R. CIV. P. 277 ("In all jury cases the court shall, whenever feasible, submit the cause upon broad-form questions. The court shall submit such instructions and definitions as shall be proper to enable the jury to render a verdict."), 278 ("The court shall submit the questions, instructions and definitions in the form provided by Rule 277, which are raised by the written pleadings and the evidence."); *see also Shupe*, 192 S.W.3d at 579 ("When a trial court refuses to submit a requested instruction on an issue raised by the pleadings and evidence, the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict.").

To sustain this issue, we are required to conclude that GH's failure to refinance the AmeriState loan supports a conclusion that ownership of the one-half interest of the landfill MSW transferred to GH reverted to MSW. However, MSW does not explain how the jury's finding that GH failed to refinance the AmeriState loan divested GH of its ownership of the landfill previously conveyed to GH or how ownership of that interest reverted to MSW. Accordingly, we are unable to conclude that the trial court abused its

28

discretion when it denied MSW's requested jury question on lost profit damages. We overrule MSW's sixth issue.

## VI.   OPTION CONTRACT

By its seventh issue, MSW contends that the MSA constituted an option contract; thus, the trial court erred when it denied its request to ask the jury the following: "Did [GH] accept MSW's purchase option resulting in an agreement for the sale of its one-half interest in the Landfill to [GH]?" Specifically, MSW argues that

> The trial court wrongly determined the MSA was not an option contract, despite the fact that the agreement includes every element of an option: (1) a privilege or right that MSW gave to GH (2) to buy certain property (3) at a fixed price (4) within a certain time; and (5) GH could compel MSW to sell if it complied with the terms set out in the option.

> The jury found GH "failed to arrange for the refinancing of the AmeriState Bank Loan as required by the MSA" and "failed to arrange for the release of the personal guarantees as required by the MSA," both within the specified time of compliance. These were critical time and manner requirements for GH's acceptance of MSW's offer to sell, as the MSA makes clear and as all witnesses testified. The jury determined GH failed to comply with the purchase terms. GH has not contested those findings.

> Although the trial court did not submit MSW's option contract questions, by virtue of the jury's answers to the other questions, GH has been determined, by the fact finder, not to have complied with this option contract. No purpose would be served by remanding the claim for trial, because the pertinent fact issues have already been decided. Those findings are binding on GH. Under an option contract, "The owner does not sell the property, but sells the privilege to buy at the option of the other person . . . . It conveys no title to the thing sold . . . An option contract conveys no title."

> Therefore, MSW is entitled to its transactional loss, lost profits, and lost opportunity cost. The jury has already determined MSW's transactional loss is $10,235 Million and its lost opportunity cost is $372,484.70. MSW's economist proved lost profits. MSW is entitled to rendition of judgment on these damages, or a remand for trial of those damages.

29

(Internal citations omitted).

This is the extent of MSW's argument. GH counters as follows: "No type of liquidated damages provision such as earnest money or an option fee exists in the MSA. The term 'option' is never used in Section 2 of the MSA, and none of the obligations on MSW are in any way conditional upon completion of the refinancing by [GH]."

> When one acquires an option to purchase property, the holder of the option purchases the right to compel a sale of property on the stated terms before the expiration of the option. Option contracts have two components: (1) an underlying contract that is not binding until accepted; and (2) a covenant to hold open to the optionee the opportunity to accept.

*Comeaux v. Suderman*, 93 S.W.3d 215, 219–20 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (internal citations omitted).

The MSA specifically states that if "MSW fails to close the purchase of the one-half interest owned by GH as provided" by section one of the MSA, "MSW agrees to sell its undivided one-half interest to GH for $7,500,000 . . . ." And 120 days after the execution of the MSA, "MSW shall provide clear title to GH by special warranty deed to its one-half interest . . . ." Thus, MSW agreed that if it did not buy GH's interest it would sell its undivided one-half interest to GH and that MSW would provide the clear title to its interest to GH by special warranty deed 120 days after signing the MSA. The MSA contains no language that we can construe as making its provisions not binding until accepted by MSW, and MSW points to no such language in the MSA. And nothing in the MSA purports to hold open to GH the opportunity to accept an option to purchase MSW's interest. Accordingly, we are unable to conclude that the trial court erred in refusing the proposed jury question. We overrule MSW's seventh issue.

30

## VII. CONCLUSION

We affirm the trial court's judgment.

JAIME TIJERINA
Justice

Delivered and filed on the
21st day of October, 2021.

31